## STATE v. KELLEY.

JURY—NEW TRIAL.—Where a jury is kept out for more than twenty-four hours with only two meals, in the meantime several times saying to the officer in charge that they could not agree, and desired to be discharged, and once making same statement to Judge, and are afterwards sent back to room with instructions to consider the case, and then find defendant guilty, a new trial will be granted. .

Before TOWNSEND, J., Darlington, March, 1895. Reversed.

Indictment against J. Newitt Kelley, for assault and battery, with intent to kill. Defendant was convicted, and appeals.

The following is the affidavit of the deputy sheriff and the statement of the Judge:

Personally appears R. J. Scarborough, who being first duly sworn, says that at the March term of the Court of General Sessions for the county and State aforesaid, owing to the sickness of his father, the sheriff of said county, deponent was in the court room in the capacity of deputy sheriff and constable during the greater part of the term, and for the most of the time that the petit jury charged with the trial of the above stated case were in the jury

room; that said jury retired to their room for the consideration of said case after the charge of the Judge about 4 o'clock P. M. on the          day of March, 1895.   After the jury had been out two or three hours there was a knock at their door, and upon deponent's responding to it, the foreman requested him to tell the Judge that they could not agree.   Deponent did so, and his Honor directed him to inquire whether their difficulty was a matter of law or of fact; what the foreman said in answer to this, deponent does not now recollect; but upon deponent's return, his Honor instructed him to let the jury alone.   By direction of his Honor the jury were given supper, and remaining in the jury room, were the next morning given breakfast. Some time after the Court convened that morning, deponent was called by a knock at the door of the jury room, and the foreman requested him to say to the Judge, "That if they stayed in there a month they couldn't agree, and they desired to come out."   Upon conveying this message, his Honor told deponent to leave them alone.   At dinner time of that day, and also at supper time, deponent went to his Honor for permission to feed the jury, but his Honor declined to permit this to be done.   Some time after dark of that day, deponent was, for a third time, called to the jury room door by a knock, and was told by the foreman to tell the Judge, "That they couldn't agree, and were hungry and wanted to get out."   The foreman came out, and the Judge asked him if it was about that case, and the foreman replying "yes," the Judge said he couldn't see one alone; let them all come out, and all of the jurors came into the court room.   His Honor asked whether their disagreement was as to a matter of law or of fact.   The reply was, matter of fact, and his Honor stated that in that he could not aid them, and told them they must go back and try to agree. After this, and the Judge having left the court room, at the request of the jury, deponent went to the Judge for permission to serve the jury with supper; he replied, that he thought they would agree sooner without it, and they came out with

a verdict. Some little time has elapsed, and I did not charge my memory with the matter, but the foregoing is what occurred, to the best of my recollection.

Statement of the presiding Judge settling case:

The jury who tried the above stated case retired with the case for consideration about 4 o'clock P. M. on March, 1895. About 8 P. M., I ordered supper to be sent to them. I ordered breakfast the next morning. About 4 o'clock P. M. of this the second day, Mr. R. J. Scarborough went to the jury room, in response to what appeared to be a knock, and, after speaking to some one, came up to me and said that one of the jury wanted to speak to me. I asked him if he was the foreman. He said no. I then asked him (Scarborough) what he wanted. He said he did not know. I asked him (Scarborough) if he was sick. He said he thought not. I said no more; neither did Mr. Scarborough. Some time later, say about 6 o'clock P. M., there appeared to be another knock at the jury room door, and Mr. Scarborough went and opened the door, and, after a brief conversation with some one, came to me and said that the foreman wanted to see me. I asked what the foreman wanted, and he said he did not know. As it was getting near night (second day), I concluded to call out the jury and ascertain what was the trouble about the case, but I did not say so to Mr. Scarborough. I merely told him to let them alone, my intention being to call them out at a convenient point in the proceedings of the Court. In a short time afterwards, half an hour, or probably an hour, there was another knock, and Mr. Scarborough responded as before, and he again told me that the foreman wanted to see me. I said, "Tell the foreman to come out." When the foreman came out, I asked him if he wanted to see me about the case, and he said yes. I then told him to tell all of the jury to come out. He did so, and they came out. The clerk called the roll, and asked the foreman if they had agreed on a verdict, and the foreman said no. I then

asked if the trouble was a matter of law or of fact. The foreman said, "Well, we don't agree." I then said, "If it. was a matter of law, I could charge you again; but since it is a matter of fact, I can't assist you, for you are the sole judges of the facts." I then added, "I think you can agree; retire to your room." All of them arose, and the foreman said, "We have been in the room twenty-four hours and can't agree." I then said, "Well, retire and consider the case," and they retired; and in the early part of the night (this I heard from others afterwards) agreed, and came out and rendered a verdict of guilty at the opening of the Court next morning. I put them in charge of some constables the first night, and gave them an envolope with the usual instructions about bringing in a sealed verdict, and these instructions were not changed. Supper was furnished the first night and breakfast next morning, and I then told the deputy sheriff, Mr. R. J. Scarborough, to give them nothing more to eat; that they would never agree if we kept on giving them sumptuous meals every meal time. I did not intend that they should suffer for food or anything reasonable and proper for them to have, nor do I believe that they did suffer for one moment. I was informed afterwards that there was only one who stood out, and that the other eleven were delighted when the rations were stopped. I heard nothing from the jury, either directly or indirectly, till 4 o'clock P. M. of the second day, as above stated, and nothing at any time about their being hungry. Nor did Mr. Scarborough, or any one else, ask me to let the jury be fed after breakfast of the second day, when I told Mr. Scarborough to stop feeding them, as I have already stated. Mr. Scarborough has certainly mixed this case up with some other case.

*Messrs. Boyd & Brown*, for appellant.

*Mr. Solicitor Johnson*, contra.

March 6, 1896. The opinion of the Court was delivered by

MR. CHIEF JUSTICE McIVER. The defendant was in-
dicted for an assault and battery with intent to kill one J.
E. Polson. The jury rendered a verdict of guilty, with a
recommendation to the mercy of the Court. From the
judgment rendered upon this verdict defendant appeals,
upon the following grounds:

"1. Because the petit jury charged with the trial of the
case, after long deliberation, on three separate occasions,
with long intervals of time intervening, notified his Honor,
the presiding Judge, that they could not agree, and desired
to be discharged from the consideration of the case, and on
each occasion his Honor directed them to be detained in
the jury room without their consent first had and obtained.

"2. Because after the jury had remained one night, on
the day following they were given but one meal, and that
breakfast, though remaining in the jury room until late in
the second night."

The facts as to what occurred after the jury, charged
with trial of this case, had retired to their room to consider
the same, must be gathered from the affidavit of the deputy
sheriff, R. J. Scarborough, who, owing to the sickness of
the sheriff, was acting as sheriff at the time, as well as the
statement of the presiding Judge, which affidavit and state-
ment are set out in the "Case," and should be incorporated
in the report of this case. While these two statements
differ in some respects, there are certain facts as to which
there is no conflict, to wit: That the jury retired to their
room about 4 o'clock P. M. of the day of the trial, fur-
nished with an envelope, "with the usual instructions about
bringing in a sealed verdict;" that about 8 o'clock P. M. of
that day, the jury were furnished with supper, by order of
the Judge, and also with breakfast the next morning, and
the deputy was told by the Judge "to give them nothing
more to eat, that they would never agree if we kept on
giving them sumptuous meals every meal time;" that the
jury remained in the room from 4 o'clock P. M. of one day
until some time—"half hour or probably an hour"—after

6 o'clock P. M. of the second day, when the jury, by direction of the Judge, came into the court room, and finding that the jury had failed to agree on a verdict, the Judge asked "if the trouble was a matter of law or of fact," to which the foreman replied: "Well, we don't agree," whereupon the Judge said: "If it was a matter of law, I could charge you again, but since it is a matter of fact, I can't assist you, for you are the sole judges of the facts," adding: "I think you can agree; retire to your room." All of the jury arose, and the foreman said: "We have been in the room twenty-four hours and can't agree;" to which the Judge replied: "Well, retire and consider the case." The jury retired to their room, and after remaining there some time in the night of the second day—how late does not appear—they came out with a sealed verdict, which was published at the opening of the Court the next morning. From this statement of undisputed facts, it is very difficult, if not impossible, to resist the impression that the verdict in this case was not the result of calm and deliberate reflection, which every verdict ought to be. As was well said by that great Judge, the late Chief Justice O'Neall, in delivering the opinion of the Court in *State* v. *McKee*, 1 Bail., at page 653: "The proposition that the Judge can have them (the jury) conveyed from Court to Court, on his Circuit, until they agree, is at war with all our notions, either of their rights or of the rules of justice and propriety. It has never been acted on in this State, and I have no hesitation in saying that it is not law. It is equally absurd to say that the jury must be starved into a verdict. Their verdict ought to be the result of calm and deliberate reflection, and not force. If, therefore, after a sufficient time has been afforded them to discuss the subject and come to a conclusion, they cannot agree, they ought to be discharged." But when, in addition to these undisputed facts, we look to the additional facts stated in the affidavit of the deputy sheriff, this impression becomes an absolute conviction. For it there appears that the jury, after having remained in

their room for a sufficient time to consider the case, which
from its nature could not have been complicated, in all of
its bearings, made repeated efforts to obtain their discharge
upon the ground that they could not agree.   The fact that
these repeated efforts were not all communicated to the
presiding Judge, as would seem to be the case from his
statement, cannot affect the question.   The jury had no
lawful means of communicating with the presiding Judge,
except through the officer in whose charge they were placed;
and the affidavit of that officer shows conclusively that
every effort in the power of the jury was made to obtain
their discharge, which, under a proper construction of the
statute, they were entitled to demand; and if these repeated
requests and demands failed to reach the Judge, as he says,
that, surely, was no fault of the jury, and they should not
have been punished and practically forced to a verdict, for
a fault to which they in no wise contributed.   To say no-
thing of the rights of the accused, and looking at the
question from the higher standpoint of the rights of juries,
and the still higher ground that it is the duty of the courts
of justice to promote the ends of justice by a due and pro-
per observance of all the forms and rules prescribed for its
administration, I cannot think that a verdict obtained in
the manner in which this was should be allowed to stand.
Of course, I must not be understood as intending to cast
any—the slightest—imputation upon the motives of the
presiding Judge, or to attribute to that high official any in-
tentional impropriety; for, on the contrary, I am quite wil-
ling to assume that the course which he pursued was
prompted solely by a laudable desire to prevent the delay
and expense of a mistrial.   But I am bound to say that I
cannot think that the course pursued in this case was legally
proper, and am, therefore, satisfied that there should be a
new trial.

    If it should be said that the question as to whether a jury,
failing to agree on a verdict within a reasonable time,
should be discharged, is addressed solely to the discretion

of the presiding Judge, the answer is of a twofold character. 1st. That since the adoption of the statutory provision incorporated in the Revised Statutes as section 2409, the question is no longer a question of discretion, but has become one of legal right, for that statute provides that: "When a jury, after due and thorough deliberation upon any cause, return into court without having agreed upon a verdict, the Court may state anew the evidence, or any part of it, and explain to them anew the law applicable to the case, and may send them out for further deliberation; but if they return a second time without having agreed upon a verdict, *they shall not be sent out again*, without their own consent, unless they shall ask from the Court some further explanation of the law." So that it will be seen from the words which I have italicized, that, in a certain contingency, which, it seems to me, practically occurred in this case, the statute is imperative, and expressly forbids the Judge from sending the jury out again, without their own consent, unless they shall ask for further instructions as to the law, of which there is, and can be, no pretense in this case, as is fully demonstrated by the emphatic declaration of the foreman, made as the jury arose to retire to their room, as directed by the presiding Judge: "We have been in the room twenty-four hours and can't agree." While it is true that the jury did not, in fact, return to the court room *a second time* without having agreed upon a verdict, yet it is very manifest from the affidavit of the deputy sheriff, that they made repeated unsuccessful efforts to do so, and were only prevented from effecting that purpose by the failure of that officer to communicate their wishes to the Circuit Judge, as he says in his statement, by whose authority alone could they be permitted to leave the jury room; and to put such a rigid construction upon this purely remedial statute, as to hold that, because the jury did not actually return into the court room a second time, although they did make repeated efforts to do so—because they did not do what they had no power to do without an open vio-

lation of the authority of the Court—would be, not only violative of one of the fundamental rules of statutory construction, but would render this benignant statutory provision, designed to prevent the harsh and unreasonable exactions imposed upon jurors—innocent persons—by the stern and rigorous rules of the common law, wholly nugatory, and would place it in the power of the officer charged with the custody of the jury, to force, from an unwilling jury, a verdict which was not the result of calm and deliberate reflection, but of force or imposition by an officer of the law.    It may be that the statutory provision above quoted is unwise and impolitic, though upon that point differences of opinion may well exist, yet it is quite sufficient for this Court to know that such is the written law, and as such it should and must be respected in spirit as well as in letter.    It may also be possible, though it is somewhat difficult to credit the statement, that the law is regarded as so impolitic as that studious efforts are made by some members of the bar to conceal from juries the rights conferred upon them by this statute in order to prevent mistrials. But surely this can furnish no argument to induce this Court to disregard the plainly written law, or even, by strained construction, to render nugatory its provisions.   If the statute is unwise or impolitic, the remedy must be sought at the hands of another department of the government, whose province this Court has no power or disposition to invade. 2d.  But even if the question could be regarded as addressed solely to the discretion of the Circuit Judge, it is very manifest from the showing made in this case, that he did not have the facts before him necessary to guide his discretion aright, which have been presented to us in the "Case" as prepared for argument here; and hence this Court has a right to presume that if the facts as presented here had been presented to the Circuit Judge at the proper time, his action would have been different from what it was.    The case, therefore, presents an instance of abuse of discretion, not due, however, it is a pleasure to state, to any improper

conduct upon the part of the Circuit Judge, but due solely to the want of light necessary to properly guide his discretion.

There is one remark contained in the statement of the presiding Judge which should not pass unnoticed. After saying that it was not his intention that the jury should suffer for food, or anything reasonable or proper for them to have, he adds these words: "I was informed afterwards that there was only one who stood out, and that the other eleven were delighted when the rations were stopped." How such information could have been *properly* communicated to the presiding Judge, it is impossible to conceive; for, by reference to the case of *Smith* v. *Culberson*, 9 Rich., at page 111, and the authorities there cited, it will be seen that a court of justice has always set its face sternly against any invasion of the privacy of the jury room; and very properly this is so, as nothing is better calculated to destroy independence of thought and action in a juror, and tends to sap the very foundation of the great right of trial by jury.

The judgment of this Court is, that the judgment of the Circuit Court be reversed, and the case remanded to that Court for a new trial.